**F I L E D**
CLERK, U.S. DISTRICT COURT

7/18/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:23-cr-00351-FMO |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 1957: Money Laundering Transactions; 18 U.S.C. §§ 981, 982, 1028 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| TAMMY LE, MACY ZIA, CHRIS RUIZ,    aka "Chris Tsang,"    aka "Fung Wah Chris Lam,"    aka "Fung-Wah Chris Ruiz,"    aka "Fung-Wah Ruiz,"    aka "Fung Wah Lam,"    aka "Fung Wah Tsang," and GALEN CLARK, | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A.  INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1    Defendants and Related Entities

2         1.   Defendant TAMMY LE was a resident of San Clemente,

3    California.  Defendant LE was the beneficial owner and chief

4    executive officer of CareAccess MSO, Inc. ("CareAccess"),

5    incorporated in California and located at 18000 Studebaker Road #100,

6    Cerritos, California.

7         2.   Defendant MACY ZIA was a resident of Fullerton, California,

8    and was employed by CareAccess as a senior accounting manager.

9         3.   Defendant GALEN CLARK was a resident of Simi Valley,

10   California, and was employed by CareAccess as an information

11   technology manager.

12        4.   CareAccess was a management services organization ("MSO")

13   that contracted with groups of independently practicing physicians,

14   known as independent practitioner associations ("IPAs"), to provide

15   non-clinical, administrative services involved in running a medical

16   practice, such as billing, marketing, and procuring and paying

17   special needs providers.  In exchange for CareAccess' services, each

18   IPA agreed to pay CareAccess a management fee that was a negotiated

19   percentage of the monthly fees the IPA received from health care

20   plans whose members received services from the IPA.  The monthly fees

21   the IPAs received from the health care plans were based on the number

22   of plan members enrolled as patients with the IPA, which was referred

23   to as "lives under management" or "capitation."

24        5.   For example, CareAccess entered into agreements to provide

25   services to Auxilium Health Network ("Auxilium") and Vitruvian Care

26   Inc. ("Vitruvian"), which were IPAs that contracted with Brand New

27   Day, a provider of Medicare Advantage health insurance plans, to

28   provide health care services to members of Brand New Day's health

insurance plans.  Under these contracts, Brand New Day paid each IPA a monthly capitation fee that was based on the number of plan members enrolled as patients with Auxilium or Vitruvian in that month. In conjunction with the payment of monthly capitation fees, Brand New Day sent the IPAs monthly eligibility lists and capitation reports reflecting the number of patients enrolled with each IPA that month. Under the IPAs' contracts with CareAccess, Vitruvian agreed to pay CareAccess approximately nine percent of the amount Vitruvian received in monthly capitation fees from Brand New Day, and Auxilium agreed to pay approximately nine percent of the amount Auxilium received in monthly capitation fees from Brand New Day.

6.   Defendant CHRIS RUIZ, also known as ("aka") "Chris Tsang," aka "Fung Wah Chris Lam," aka "Fung-Wah Chris Ruiz," aka "Fung-Wah Ruiz," aka "Fung Wah Lam," aka "Fung Wah Tsang," was a resident of Pasadena, California, and was the owner of Auxilium.

Bank Accounts Controlled by Defendant LE

7.   Defendant LE controlled and was a signatory on the following bank accounts, among others:

a.   A personal checking account ending in 8330 at Citibank in the name of defendant LE and another individual ("the "8330 Account").

b.   A business checking account ending in 5465 at Signature Bank in the name of CareAccess ("the 5465 Account").

c.   A personal checking account ending 6211 at Bank of America in the name of defendant LE.

B.   THE OBJECT OF THE CONSPIRACY

8.   Beginning no later than in or around January 2020, and continuing through at least in or around July 2021, in Los Angeles

3

and Orange Counties, within the Central District of California, and elsewhere, defendants LE, ZIA, and RUIZ conspired with one another, and with others known and unknown to the Grand Jury, to commit wire fraud, in violation of Title 18, United States Code, Section 1343. Defendant CLARK joined the conspiracy no later than in or around November 2020.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

9.   The object of the conspiracy was carried out, and was to be carried out, in substance, as follows:

a.   Defendants LE, ZIA, RUIZ, and CLARK would fraudulently obtain money from lenders and investors by falsely representing the scope of CareAccess' business and its anticipated revenues.

Funds Obtained from Alleon through Fraud

b.   Defendant LE would cause CareAccess to enter into a factoring agreement with Alleon Capital Partners ("Alleon"), a finance company located in Teaneck, New Jersey.  Under the terms of the agreement, Alleon would make loans to CareAccess in exchange for rights to collect against CareAccess' accounts receivable, including the fees due from Auxilium and Vitruvian.  In order to induce Alleon to enter into the agreement and make these factoring loans, defendant LE, ZIA, and RUIZ would make, and cause to be made, false statements to Alleon regarding the monthly capitation or "lives under management" of the IPAs that CareAccess serviced, including Auxilium and Vitruvian, and the fees that CareAccess expected to receive from the IPAs, i.e., the amounts of the corresponding accounts receivable.

c.   To support these false representations and induce Alleon to continue to extend credit to CareAccess under the factoring agreement, defendants LE and ZIA would send Alleon fraudulent copies

4

of invoices that CareAccess purportedly issued to the IPAs.  The invoices were accompanied by spreadsheets containing the number of patients purportedly enrolled with the IPA.  These invoices and spreadsheets falsely and fraudulently inflated the monthly capitation of the IPAs and the amount of management fees that CareAccess claimed it was entitled to receive from the IPAs.

d.   To further support these fraudulent invoices and spreadsheets, and to impede Alleon's ability to detect the fraud, defendant LE, together with other co-conspirators, would obstruct Alleon's ability to verify the balances reflected on the fraudulent invoices by providing Alleon with purportedly independent points of contact at the IPAs but who, in fact, were associates of defendant LE and the co-conspirators. Defendant LE would arrange for the purported points of contact to falsely verify to Alleon the inflated figures in the fraudulent reports and invoices.  For example, at defendant LE's direction, defendant RUIZ was identified as the point of contact for Auxilium and, when contacted by representatives of Alleon, fraudulently verified the false information contained in the fraudulent invoices purportedly issued to Auxilium.  In another example, the phone number that defendant LE provided to Alleon for the purported point of contact for Vitruvian was actually the phone number for a CareAccess employee ("Employee 1"), who, at defendant LE's direction, pretended to be an employee of Vitruvian when answering phone calls from Alleon and verified the false information contained in the fraudulent invoices purportedly issued to Vitruvian.

e.   Through these misrepresentations, defendants LE, RUIZ, and ZIA caused Alleon to transfer by interstate wire approximately $6.1 million in factoring loans into the 5465 Account defendant LE

owned, which funds defendant LE would direct to be used by defendants LE, ZIA, and RUIZ to further the conspiracy.

Funds Obtained from Cimarron through Fraud

10. Beginning in or about November 2020, defendant LE would solicit Cimarron Healthcare Capital ("Cimarron"), a healthcare investment company located in Salt Lake City, Utah, to invest in and eventually acquire CareAccess. In order to persuade Cimarron to acquire CareAccess, defendants LE, ZIA, CLARK, and RUIZ would make and cause to be made to Cimarron material false and fraudulent pretenses, representations and promises, including false pretenses, representations and promises regarding the monthly capitation or "lives under management" of the IPAs that CareAccess serviced and the balances in CareAccess' accounts receivable based on the fees due from the IPAs, including Auxilium and Vitruvian, and would conceal and cause to be concealed from Cimarron material facts regarding CareAccess' finances and accounts receivable.

a. To support these false pretenses, representations, and promises, and the concealment of material facts, and to lull Cimarron into providing investment and purchase funds to CareAccess, defendants LE, ZIA, CLARK, and RUIZ would:

i. generate and provide false and fraudulent capitation reports and eligibility lists to Cimarron that reflected falsified and inflated numbers of members enrolled with IPAs under contract with CareAccess, including Auxilium and Vitruvian. For example, the fraudulent capitation reports and eligibility lists provided to Cimarron reflected that the IPAs serviced by CareAccess had more than 20,000 enrolled members, when as defendants LE, ZIA,

CLARK, and RUIZ knew, the IPAs had fewer than one percent of that inflated number of enrolled members;

ii. create and provide false and fraudulent CareAccess invoices, checks, and other financial documents to Cimarron that reflected falsified and inflated revenues and expected revenues of CareAccess;

iii. impede and obstruct Cimarron's ability to conduct due diligence by generating and providing Cimarron with access solely to a "cloned" computer server that contained a second, falsified set of financial records for CareAccess, while preventing, and causing others to prevent, Cimarron from accessing CareAccess' server containing its true financial records; and

iv. prevent and cause others to prevent Cimarron from obtaining truthful information about CareAccess' revenues and the actual monthly capitation figures of the IPAs that CareAccess serviced.

b. Through these misrepresentations, defendants LE, ZIA, CLARK, and RUIZ caused Cimarron to provide approximately $12.7 million for the acquisition of CareAccess, of which defendant LE would direct $2.2 million to be deposited into the 8330 Account and used for defendant LE's personal benefit, and a substantial portion of the balance to be used by defendants LE, ZIA, CLARK, and RUIZ to further the conspiracy. Within months of Cimarron's $12.7 million purchase of CareAccess based on the defendants' false representations and pretenses about its financial status and revenues, CareAccess filed for bankruptcy.

D.   OVERT ACTS

11.   On or around the following dates, in furtherance of the conspiracy and to accomplish its object, defendants LE, ZIA, CLARK, and RUIZ, together with other co-conspirators, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California:

Overt Act No. 1:   On April 21, 2020, defendant LE sent an email to Alleon and attached fake invoices purportedly issued by CareAccess to Vitruvian and Auxilium that falsely and fraudulently inflated the amount of fees that CareAccess expected to receive from the IPAs.

Overt Act No. 2:   On July 10, 2020, defendant LE sent an email to Alleon that listed names and phone numbers for purported points of contact for Vitruvian and Auxilium.

Overt Act No. 3:   On September 28, 2020, in response to a text message from Alleon requesting verification of the amount that Auxilium owed CareAccess in management fees per the April 2020 invoice, defendant RUIZ responded "650K."

Overt Act No. 4:   On November 30, 2020, in response to a text message from Alleon requesting verification of the amount that Auxilium owed CareAccess in management fees per the May 2020 invoice, defendant RUIZ responded "645K."

Overt Act No. 5:   On November 24, 2020, defendant CLARK sent defendant LE an email attaching a .zip file that contained several spreadsheets reflecting thousands of patient names and other identifying information.

1    <u>Overt Act No. 6:</u>   On December 14, 2020, defendant LE signed a
2  Letter of Intent on behalf of CareAccess in connection with
3  Cimarron's investment in CareAccess.

4    <u>Overt Act No. 7:</u>   On January 12, 2021, defendant LE sent
5  Cimarron an email that attached four spreadsheets listing members
6  purportedly enrolled in certain IPAs, including Auxilium and
7  Vitruvian.

8    <u>Overt Act No. 8:</u>   On January 13, 2021, defendant LE sent
9  defendant ZIA an email that contained numbers of members enrolled in
10 certain IPAs each month for January 2020 through November 2020, and
11 stated to defendant ZIA "This is our bible, let's keep this close to
12 us 😊"

13   <u>Overt Act No. 9:</u>   On January 13, 2021, defendant LE sent
14 Cimarron an email that attached a CareAccess income statement
15 reflecting CareAccess' purported monthly income for January 2020
16 through November 2020.

17   <u>Overt Act No. 10:</u>   On January 19, 2021, defendant LE sent
18 Cimarron an email that attached a capitation report and eligibility
19 list of Auxilium reflecting the number of purported members enrolled
20 with Auxilium.

21   <u>Overt Act No. 11:</u>   On March 1, 2021, defendant ZIA sent a
22 Microsoft Teams chat message to a CareAccess employee ("Employee 2")
23 asking her to "pull [defendant LE's] bank account from ez printing,
24 remove her name on top (basically blank from payor, no name, no
25 address) then issue a check to CAMSO $310,673.57 and memo march 2020
26 management fee."

27

28

COUNTS TWO THROUGH SEVEN

[18 U.S.C. §§ 1343, 2(a)]

[ALL DEFENDANTS]

12.   The Grand Jury re-alleges paragraph 1 through 7, 9 through 11 of this Indictment here.

A.   THE SCHEME TO DEFRAUD

13.   Beginning no later than in or about January 2020, and continuing until at least in or about July 2021, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants LE, ZIA, and RUIZ, together with others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Alleon and Cimarron as to material matters, and to obtain moneys, funds, assets, and other property owned by and in the custody and control of Alleon and Cimarron by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  Defendant CLARK joined the scheme no later than in or around November 2020.

14.   The fraudulent scheme operated and was carried out, in substance, as described in paragraphs 9 and 10 of this Indictment.

B.   USE OF THE WIRES

15.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendants LE, ZIA, CLARK, and RUIZ, aiding and abetting each other, transmitted and caused the transmission of the following items by means of wire and radio communication in interstate commerce:

| COUNT | DATE | TRANSMISSION | DEFENDANTS |
|---|---|---|---|
| TWO | 07/10/2020 | Interstate email from defendant LE to Alleon containing names and phone numbers for purported points of contact for IPAs and attaching purported invoices issued by CareAccess to IPAs | TAMMY LE MACY ZIA CHRIS RUIZ |
| THREE | 10/14/2020 | Interstate email from defendant LE to Alleon attaching spreadsheet titled "CareAccess.Funding Batch.2020.10.14.pdf" | TAMMY LE MACY ZIA CHRIS RUIZ |
| FOUR | 10/14/2020 | Transfer of $200,000 in factoring loan proceeds from Alleon, sent by means of an interstate wire from New Jersey, into the 5465 Account in California | TAMMY LE MACY ZIA CHRIS RUIZ |
| FIVE | 01/12/2021 | Interstate email from defendant LE to Cimarron attaching purported member lists of four IPAs | TAMMY LE MACY ZIA CHRIS RUIZ GALEN CLARK |
| SIX | 01/28/2021 | Interstate email from defendant LE to Cimarron attaching three images of purported checks from Auxilium payable to CareAccess | TAMMY LE MACY ZIA CHRIS RUIZ GALEN CLARK |
| SEVEN | 02/02/2021 | Transfer of $2,334,622.64 from CAMSO Holdings LLC, sent by means of an interstate wire, into the 8330 Account in California | TAMMY LE MACY ZIA CHRIS RUIZ GALEN CLARK |

COUNT EIGHT

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

[DEFENDANT LE]

16.   The Grand Jury realleges paragraphs 1 through 7, 9 through 11, 14, and 15 of this Indictment here.

17.   On or about July 10, 2020, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant LE knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant LE knew belonged to another person, namely, the names "Dr. S.U." and "Dr. K.K.," during and in relation to wire fraud, a felony violation of Title 18, United States Code, Section 1343, as charged in Count Two of this Indictment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINE

[18 U.S.C. §§ 1957, 2(b)]

[DEFENDANT LE]

18.   The Grand Jury re-alleges paragraphs 1 through 7, 9 through 11, 14 and 15 of this Indictment here.

19.   On or about February 10, 2021, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant LE, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged in and willfully caused others to engage in a monetary transaction, in and affecting interstate commerce, of a value greater than $10,000, namely, a transfer of $2,282,765.72 from the 8330 Account to West Coast Escrow through a wire transfer, receipt number 9214, such funds having, in fact, been derived from specified unlawful activity, that is, wire fraud, committed in violation of Title 18, United States Code, Section 1343, as alleged in Counts Two through Seven of this Indictment.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Eight of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.     Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the defendant's conviction of the offense set forth in Count Nine of this Indictment.

2.     The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in

committing the offense or offenses giving rise to the forfeiture,
conducted three or more separate transactions involving a total of
$100,000.00 or more in any twelve-month period.


                                    A TRUE BILL


                                    _____/S/_____
                                    Foreperson

E. MARTIN ESTRADA
United States Attorney


MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds
Section

DAVID H. CHAO
VALERIE L. MAKAREWICZ
Assistant United States Attorneys
Major Frauds Section